Good morning and welcome to the Ninth Circuit. I'm Bridget Beatty. I have my chambers here in Phoenix. I'm very pleased today to be joined by Judge J. Bidey and Judge Richard Clifton, who are from Las Vegas and Honolulu. This morning we have two cases for argument and the other cases have been submitted. The first case for argument this morning is Milia Promotional Services v. State of Arizona. May it please the Court. My name is David Abney, here representing Milia Promotional Services and Camilla Harris. She says it's pronounced Camilla, even though there was an I-A on the end. These kinds of cases are difficult because you cannot depend on one particular item of evidence, except in the very rarest of cases. There are a number of items that have come together in this particular case to show a pattern of discrimination based on race. Any one of those individually probably would not carry the case. But if you add them up in total, it creates a situation where there is enough to go to the trier of fact. One of the strengths of this case was that we had an extremely good district court judge, well-respected. But one of the weaknesses of being an extremely well-respected good district court judge is a tendency to decide cases on the merits when they really need to go to the jury. All the reasonable inferences from the evidence are supposed to be taken in favor of the non-moving party. All of the evidence is supposed to be viewed in the light most favorable to the non-moving party. And actually, if you look at the Celotex, Anderson, Liberty Lobby cases from the 1986 or so, they set the framework that we follow, even in our Arizona State Courts under Orm School, that you're supposed to defer to the jury whenever there is any sort of reasonable disputed material fact. And actually, you're supposed to take as true, at least provisionally, what is being set out by the non-moving party. You take the facts as true. You don't necessarily take the inference drawn by plaintiffs that this is discriminatory or reflects a hostile attitude as true. You look at the facts. And I have to say, I look at the facts, and it seems like your client perceives any criticism of the services provided by her or her company as prima facie evidence of discrimination. And I'm not sure I can draw the inference that you say that I'm required to draw. The standard is... Did she do no wrong? Could she not fall short in providing services? Isn't she susceptible to criticism? We all fall short of the glory of God, no question about that. But in this particular case, she laid out instance after instance where she is being treated differently than white vendors. Well, not really. I mean, give us some particulars. I look at your brief, and you try to illustrate, well, there are these two white vendors that are treated differently in some way, but we don't know that that's a representative sample of vendors or white vendors at all. I mean, you can pick and choose things, but what evidence would you cite that should leave us with the impression that there is a genuine issue with regard to whether there was discrimination? Well, you had, for instance, the pay increase issue. Well, she wasn't cut when others were. Exactly how is that discrimination? No, she did not. Her pay increase... She requested a pay increase. It was denied. She was not cut at a time when they were asking 10% cuts from others. How does that reflect discrimination? There was no explanation to her for what had happened. Well, wait a minute. How does that reflect discrimination? Well, at a minimum, you would expect if you're being treated fairly by the government that you get an explanation. But we don't know that she's not being treated fairly when her fee wasn't cut and other vendors had their fees cut. But the other vendors were making much more than she was, and as far as the rate increase, there was no explanation or justification to her as to why her application was not granted. So if I go into my boss or Congress sets our salaries and say, give me an increase, and they don't bother to explain why they're not giving me an increase, that's discrimination? Well, suppose they falsely tell you that we did an audit, we're going to do an audit, and they don't do the audit. Or they're going to say that you have errors in your rate increase form when there were no errors and they didn't identify the errors. And then later on, you find out when you get to the ultimate decision-maker, I have no idea why you didn't have the rate increase. Mr. Evany, remind me how much what her rate was. It was 68? Yes. And how much was the rates that she thought others were getting? 79 or 80 in that vicinity. And do you know whether the agency compensated for people who had more experience? I don't think that the record reflects that, Your Honor. What we do know is that Camilla was experienced. So your claim is that if somebody was making 80 and she was making 68, that's a difference of $12? It's a substantial difference on an hourly basis, Your Honor. But if they were taking a 10% cut, that would have narrowed it substantially. If she would have been 68, they would have been maybe 72. And that still is a difference, but it may be explainable by other factors. It may be explainable, but they didn't provide the explanation. And at the end of all this process, the lady who was the ultimate decision-maker explained what happened, so they had no idea. Do you have any evidence of direct discrimination? Do you have any direct evidence of discrimination as opposed to circumstantial evidence? Is it all circumstantial? I think that there is some direct evidence. I think the bus driver metaphor is direct evidence of discrimination, discriminatory thinking. How is that direct evidence of discrimination? Any black person of even moderate education in the United States knows about Rosa Parks and the Montgomery bus boycott and the habit in the South, where I grew up, by the way, of making sure that blacks were treated as second-class citizens and sent literally to the back of the bus if they were able to get on the bus at all. The way that analogy fails is that the vendors were the bus stops. The customers or the clients were the passengers, and the agency was the bus driver, something along those lines. It was not a great analogy, but it doesn't seem to fit with the suggestion of discrimination. There was no suggestion that vendors were going to the back of the bus. It was not a perfectly expressed statement. Personally, I attribute that to ignorance about exactly what happened with Rosa Parks. Or maybe the person was just using an analogy. Maybe. So any time a bus is mentioned in any context, that's evidence of discrimination? No. But in this particular context, the way it was used to try to put her back and set her back, I would say that, yes, that would be a reasonable inference could be that that bus metaphor was a reference. But she's not described as a rider. She's described as a bus stop. I know. A bus stop in a bad neighborhood? It's really not an easy inference to draw. And you have acknowledged that individually they may not amount to enough, but you've got to add them up, but you've got to have something to add up. What exactly suggests discrimination there other than a general reference to bus? And there's no mention of back of the bus. She's not described as a passenger. Well, as I said, it's not a perfect metaphor. So give us another example of something that demonstrates discrimination. The description of Camilla as argumentative, combative, unapproachable, not easy to talk to, talks over people to get her point across. Okay, I'll apply that description to lots of non-minority people I know. Does that mean that somebody who is of a minority group can't fulfill those characteristics? It can be. But then again, this is really for the jury to evaluate her, get her on the stand, let the jury listen to her, watch her, see how she behaves, see that she is a mild-mannered, educated, calm, reasonable person, as opposed to the description of an angry black woman. When I grew up in Florida, I was born in 53, moved to Arizona in 67, and this is just code. The word we used back then was uppity, and that's the way they're treating her, as if she was an uppity person. There was bad words that went with uppity. I'm not going to say them in this courtroom because I'm shed of that. I have, I guess, a more fundamental question. Looking at your brief, in the opening brief, I didn't see any challenge to the district court's determination that plaintiffs had not established a prima facie case, which would suggest that that argument is waived. Can you tell me where in the brief you argued and challenged the district court's determination there wasn't a prima facie case shown? And I saw that in the answering brief, and I didn't understand the argument. I still don't understand the argument. I think the argument is pretty clear. Can you reference something in the brief that says the district court was incorrect, we did show a prima facie case? And if you can, that would be great if you could tell me where it is. You're probably going to throw a shoe at me, but I think the entire brief establishes the prima facie case. It's going through this description of all these different circumstances, circumstantial circumstances. Well, that seems redundant. In all these circumstances that add up to a circumstantial case, they show there's a prima facie case of discrimination against her based upon race, racial animus. I think that's enough to say that they did set forth a prima facie case. Then it's to the government to say, oh, no, we have some justification for it, and then we go back to, well, this is all a pretext. Well, that seemed to be what your brief was about, countering the government's position that they had offered legitimate explanations for any adverse employment or contracting decision. And the brief was arguing, oh, no, this was all pretext. Yes. But I didn't see the brief saying, here are the elements of the prima facie case. This is what we proved. This is what we offered. The district court is wrong. We did establish a prima facie case. Well, I think under Rule 1, at least in our rules of civil procedure, the rules are supposed to be construed, all these procedure rules are supposed to be construed to do justice. Well, I think you're in bad shape if you're relying on Rule 1 in general principles. I mean, you have to file a brief. You have to make an argument. You can't just make it so that we have to hunt for it, right, like the analogy from Judge Posner or Easterbrook. One of them said the pigs searching for truffles, whatever. We're not doing that. We need to have an argument put in front of us. I hate that metaphor. But, no, and I'm not asking the Court to search for truffles. I think the opening brief itself establishes the prima facie case. So you're not able to cite me to particular pages? Well, the yes, the statement of the case from page 2 down to page 15, and then the summary of the argument, that sets out what is really a prima facie case. These are the things that were done. And my predecessors talked about the denial of the rate increase, the disallowance of use of the logo, adverse action relating to clients S, M, and L, and other acts implying racial animus. That is a prima facie case right there. And then he shifts gears later on in the opening brief to talk about, well, this is a pretext. And here's why it's a pretext. So one of the elements of a prima facie case is you have to point to similarly situated comparators. Can you tell me who were the comparator contractors that you're using to establish that? Well, the other vendors that were mentioned in that description of what happened, the way they're being treated differently. And the fact that she is not. Can you be specific? What vendors? It seemed to me it was a generalized argument that we think others are being treated differently or better. Well, yeah. We talked about the vendors concerning the rate increase, the two white vendors. We also talked about in relation to clients S, M, and L, the way that she was being treated differently in her handling of those clients than other people were being treated. So I think that opening part of the opening brief sets out a prima facie case sufficient to go forward from that point, to describe this is the bad stuff that has happened. And then later on you talk about, well, it's really a pretext, the excuses that the government is providing. If I may reserve my remaining time. Yes, thank you. Thank you, Your Honor. Good morning, Your Honors. Byron Babione and Rebecca Baines for the defendants. Your Honor, I would like to first, I really would like to address two points if the court wants to hear it. But I want to talk about the statute of limitations and the equitable estoppel argument. And I want to talk about the point that the plaintiffs have failed to show any substantial circumstantial evidence that the nondiscriminatory reasons the defendants gave for their conduct was a pretext. But I want to address a few things that counsel for the plaintiffs said. He said that to find substantial circumstantial evidence, you have to find a pattern of discrimination. Well, in all of these incidents that they cite, they involve different people. And in most cases, none of the named defendants. For example, the rate increase had nothing to do with the defendants. They didn't even work in that part of the agency. The people that denied plaintiffs Harris's rate increase were in the procurement office. There's no nexus between them and the VR counselors that are named in the complaint. Okay. I want to make sure I get this right. So she alleged that there were other vendors that were compensated at much higher rates than she was. Now, is that fact true or is that not true? Well, it is true that other vendors had higher rates than her. And the reasons for that are because you do have vendors that have longevity. They may have more tools with their organization. There are a lot of reasons why they could have a lot of rates. Now, Plaintiff was a relatively new vendor. Her contracts, I think, the earliest were 2015, 2016. And we're talking about a rate increase request in 2016. There are a lot of vendors that have been doing this for 5, 10, 15, 20 years. But the plaintiff never put on any evidence that she was similarly situated to those vendors with respect to the rate increase. Had plenty of time over two years to explore that on discovery, to determine whether or not that was true or not true. But they didn't prove that at all. They did not show that they were similarly situated, Your Honor. And, of course, Judge Clifton, the plaintiff, of course, is susceptible to criticism. There's a lot of moving parts in this. And she needs to be susceptible to criticism as well as the people that work for the agency. This is a business where there are a lot of difficult conversations. You have people with disabilities that are struggling. And on the one hand, the agency has to make sure that their money that's being paid to the vendors is being used effectively. They have to ask a lot of questions. Why isn't this person registered for school? Why haven't they not progressed? And, of course, that's the case with client S primarily. And they had arguments. And there were difficult conversations between each other. But that does not infer racial discrimination. What about the objection or concern expressed that there was not an explanation for decisions made by the department? Decisions, rate increase being one, but I infer others as well. Yes, Your Honor. I would refer you directly to excerpts of Record 78. That is the email from Nyla Henson which specifically explains the reason for the rate increase. And she explained, we are seeking a 10% reduction in rates from all vendors. That's what we're doing this year because they're doing, you know, tightening the belt. And what they said to her is they said, but we understand you want a rate increase. We're not going to give you a rate increase. But we're not going to ask you for the 10% reduction. And she didn't get a 10% reduction. So the non-discriminatory reason was given to her almost instantly when she asked for the rate increase. We're seeking a 10% reduction. We won't seek it for you because we're not going to give you a rate increase this year. And there has been no evidence on the record at all that that somehow was a pretext. The plaintiffs offer two reasons to say that, well, they offer this to say why the statute of limitations on that claim should be told. But they also offer this to say, well, that was a pretext. And they refer to an email from Barbara Avalos who had, at the time, she had nothing to do with the rate increase request or the denial. In fact, this is probably a year and a half or two years later. But she's researching the reason that Harris was denied the rate increase. And she was asked to do that. And she speculated in the email. She said, you know, I wonder if it was because the request wasn't timely. I wonder if there was insufficient explanation. And they say, see, that's not the real reason. Now they're trying to say it's because she didn't fill out the form timely. But in the same day, or I'm sorry, it may have been the next day, she looks into it. And she comes back. And in the record she says, oh, I looked at the records. And the rate increase was denied because they were asking everybody for a 10% reduction in rates. But they did not reduce Harris's rates. So there's no evidence of, you know, that's not fraudulent concealment. And nor is it evidence of some pretextual reason. The other reason they offer is that Defendant Mackey testified in her deposition that there was a sunset audit that was done in January 2017, six months after the rate increase denial. And she said the sunset audit basically showed us what we already knew, that Arizona is paying more for these types of services and getting less results than 37 or 38 other states. And she said that definitely led to a tightening of the belt. But Arizona was trying to tighten their belt before that. There was an ADOA, SPA initiative to try to spend less on these vocational rehabilitation services. And, in fact, you can see that in Avalos' email, too. And that's excerpts of Record 95. So neither of those reasons show that the nondiscriminatory purpose for denying the rate increase was based on racial discrimination. There's no direct evidence of it. There's no substantial circumstantial evidence. There's no circumstantial evidence of that. I want to understand from plaintiff's counsel's, your colleague's argument a few minutes ago that much of the concern here arises from references made that could be interpreted as, well, what we've come to call dog whistles. And it is certainly true there are terms used that elicit responses that may not be automatically understood from the words used. In this case, you heard the reference, I'm sure, about the bus analogy and Rosa Parks and back of the bus, and the description of plaintiff as an angry woman argumentative, and the other terms used. Why can't those be used to make out a case for discrimination? Because they do send signals to people reflecting racial attitudes. Well, the courts have held, not only in this circuit, but in other circuits, that these types of stray remarks that may be offensive at a particular level of generality do not serve as direct evidence of discrimination. You really have to have something on point. For example, if you take the Lindsay cases, which both parties have cited, in the Lindsay case, you have circumstantial evidence, you have people in similarly situated nonprofit or white persons who were treated better than the plaintiff in the case, and there are direct references in a derogatory way to the plaintiff's nationality. You have to have something like that, like a racial slur or a racial epithet. You can't take these terms that may be offensive or somebody may subjectively suspect that is racially motivated. That is not enough to make out a claim for Section 1981. And at the end of the day, essentially what Defendant Poets was saying to Harris was, I find she's not easy to talk to. I find that she's difficult to talk to. I can't have a discussion with her. And yes, it's critical. But as Harris herself admitted under oath, she said, yeah, that combative, not easy to talk to descriptors like that could apply to a person of any race. And there are no Court of Appeals decisions or Supreme Court decisions that would take any other context like that, a nonracial epithet or a racial slur, and then call that evidence of discrimination. And Harris refers to the bus metaphor as the back of the bus metaphor, you know, trying to evoke Rosa Parks. But it wasn't a back of the bus metaphor. It was a bus metaphor where VR, the counselors, they're the drivers of the bus. In other words, they chart out the plan for the rehabilitation services. They work that out with the client. Then they take the clients and they bring the client to the vendor. That's all that metaphor said. Nobody in that metaphor is on the back of the bus. And in this case, Harris, the vendor, isn't even on the bus. So, you know, you can't start, at the end of the day, they're saying because you said the word bus, you must have meant this in a racially discriminatory way. That does not satisfy racial discrimination under Section 1981. Also, well, pardon me, I addressed the not easy to talk to words. But counsel said, well, you know, this is, they're trying to say that she's uppity. You know, that she is an uppity black person. They refer to, they say they're calling her an angry black woman. They never said anything like that. Those terms were not used. That's why they have to take this common language that might be used in a difficult conversation with anybody, and then they have to transform it into phrases like angry black woman, uppity. None of these things were said. None of these things are on the record. And I would also like to address this. The plaintiffs did not show, with respect to all of these claims, that they were similarly situated to non-African American vendors. I already addressed that with respect to the rate increase denial. But in terms of being criticized at certain points, they have no evidence that a non-African American vendor does not get criticized at points, that there aren't difficult conversations with them. There is zero evidence that non-African American voters get to choose what clients they work with in perpetuity. There is no evidence that any non-African American voters had static referrals or increases in referrals at the time that Harris claims her referrals went down. And those referrals, I mean, they can reflect so many things. The market, there's testimony in the record from Defendant Mackey that, you know, there is no steady line of referrals to each vendor. You know, you work the business, your name gets out there, people request you, there's no steady line of referrals. A lot of times it depends on how much you work that much, how much you hustle, or how many other clients are talking to other clients and bringing up your name. So, and under the contract terms, it says that, it says, hey, we don't guarantee any amount of referrals. And we don't guarantee that once you start working with a particular client, you can continue to do that. VR retains the right to make decisions, and if they think, well, there's not a lot of progress with this client, for example, with Client S, and it's undisputed in the record that Harris had provided 360 hours of work with Client S. And, of course, what he's saying, it's all her fault, but he wasn't going very far. He scrubbed out of, he washed out of the nursing school, he continued to have problems reading, they did vocational rehabilitation evaluations, and said, you know, he can't do the things that he's trying to do. You know, we can't keep putting money into trying to fit a square package. We need to adjust so he doesn't feel so frustrated and like he's being set up for failure, and that's what he said. He said, I feel like I'm being set up for failure. And so Poets and Daugherty got him on another track, they said, here's what we think is a good thing for you to do. Keep your job, because you don't want to lose your job. Then go take some remedial reading classes, and when you're ready, come back to VR, and we'll see if we can set you up for some schooling in these types of employment that you want to seek, but you just need to have much better reading skills to do. That's all that happened. That's a nondiscriminatory reason, and there's no evidence in the record that Poets or Daugherty did that because they didn't like Harris, or because of her race. Harris is upset because she doesn't get to bill on that client anymore, and sure, you might want to have as many clients as possible and billing as much as you can, but that doesn't translate into racial discrimination. You are over time now. Would you like to wrap up, please? Yes. Well, if I'm over time, I'll stop there, unless the bench has any questions for me before I sit down. No, thank you. And we'll ask the clerk to add another minute to Mr. Abney's rebuttal time, because we let opposing counsel go over by about a minute. Thank you. There are appeals where I pray for inspiration, and sometimes it comes, and I hope it comes today. The summary judgment standard is so generous to the nonmoving party, but it's so often overlooked. One of the most important parts is not only to take all reasonable inferences in favor of the nonmoving party, and to view all the evidence in the light most favorable to the nonmoving party, but not to weigh credibility, not to determine credibility, not to weigh the evidence, to, if there's any doubt, you let the case go to the jury. There are many issues of fact here that should go to the jury. We talked earlier about the issues of fact. Yes. I distinguished already between fact and inferences drawn from the facts. And I don't see much in the way of dispute of events. I see different views of what inferences should be drawn from those events. That's exactly right. Well, what precedent tells me we have to accept plaintiff's view of the evidence in terms of the inferences drawn? We look at the evidence as favorable as we can to the plaintiff, but that doesn't mean we accept whatever the plaintiff's understanding of what should be demonstrated by that. Because otherwise there could never be summary judgment. Plaintiffs always think that the evidence supports their case ultimately, and that's not the law. So do you have something to cite me to that tells me I need to accept the inferences drawn by plaintiff if we don't think they're reasonable? Anderson, Liberty Lobby, and Celotex all say that all reasonable inferences from the evidence have to be taken in favor of the nonmoving party. Well, that's different. We look at reasonable inferences. What inferences can be drawn by a reasonable jury? And I'm looking for what suggests to me that the inferences that plaintiff has drawn and that you think should be drawn are, in fact, reasonable inferences. Well, isn't that itself a jury issue? No, it can't be, because otherwise you could never have summary judgment. The question is what could a reasonable jury infer, not what somebody else could infer and hope to persuade a jury to decide upon. A reasonable jury could reasonably infer that these acts taken together indicate that there's a racial pretext, racial motive for what happened. Based on what racial evidence? Well, for instance, denial of the rate increase and the two white vendors were not getting... Do we know what was paid to other white vendors? You can pick out a couple examples, but that doesn't mean that it actually reflects the universe. We know they were being paid more, and we know that there was this 10 percent decrease. It was supposed to apply to all vendors, so her relative position would remain disfavorable. We also know the logo denial. The white vendors were allowed to use the logo, but you had to get permission to do so. She had not received permission, and she ends up taking it off of her website. Did she ever apply for permission? I believe the fact said that she was denied permission. That was not my understanding from the record, but she simply took it off the website. But it was in the contract. That seems like a pretty good explanation. Well, that's one explanation. Another explanation is that the white vendors were allowed to use logos because they were white. Do you have any evidence of that, though? We didn't depose white vendors. Did we depose any people who were in the position to permit the logos? All we have is the circumstantial evidence that she didn't have it and they did. But that's not an explanation. When the contract says you can't use this without permission, and she does not dispute she did not have permission. So she takes it off her website, and now others are using it, but there's no evidence that they were allowed to use it without getting the permission that was required of her. Well, I'll have to stand on the briefing that we put in on the logo issue, Your Honor. And I burned through my time really fast. Thank you. Thank you.
judges: CLIFTON, BYBEE, BADE